## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD B. BIGGERSTAFF, On Behalf Of Himself And All Others Similarly Situated, ) ) ) | **Civil Action No.:** _____ |
| Plaintiff, ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. ) ) | |
| DAVID C. SWANSON, STEVEN M. BLONDY , and R. BARRY SAUDER, ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based on the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff and his counsel, which are based on personal knowledge. The investigation of counsel is predicated on, among other things, a review of public filings by R.H. Donnelley Corp. ("RH Donnelley" or the "Company") with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports about the Company, and publicly available trading data relating to the price and volume of RH Donnelley common stock.

### NATURE OF THE ACTION

1.       This is a securities fraud class action on behalf of all purchasers of the common stock of RH Donnelley between July 26, 2007 and May 29, 2009, inclusive (the "Class Period") for violation of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction exists pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

3.     Venue is proper in this District because Defendants have their principal executive offices in this District, and many of the wrongful acts alleged herein took place or originated in this District.

4.     Defendants used the instrumentalities of interstate commerce, the U.S. mails and the facilities of the national securities markets in connection with the wrongful activity alleged herein.

## PARTIES

5.     Plaintiff Donald B. Biggerstaff purchased RH Donnelley common stock as set forth in the accompanying certification, which is incorporated herein by reference, and was damaged thereby.

6.     Defendant David C. Swanson ("Swanson") was, at all relevant times, the Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") of the Company

7.     Defendant Steven M. Blondy ("Blondy") was, at all relevant times, the Executive Vice President and Chief Financial Officer ("CFO") of the Company.

8.     Defendant R. Barry Sauder ("Sauder") was, at all relevant times, Vice President, Corporate Controller and Chief Accounting Officer (Principal Accounting Officer) of the Company.

9.    RH Donnelley provides local search solutions and services in the United States. The Company publishes yellow pages directories that provide businesses a basic listing that includes the name, address, and telephone number of the business in alphabetical order in the relevant classification; and white pages directories to residences and businesses in a given area that comprises the name, address, and phone number of each residence or business. It also offers awareness products that allow businesses to advertise in a variety of high-visibility locations on or inside a directory. RH Donnelley is not named as a defendant in this action because on May 28, 2009, the Company filed for protection under the U.S. bankruptcy laws.

10.    Defendants Swanson, Blondy, and Sauder ("Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of RH Donnelley's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Defendants are liable for the false statements pleaded below.

## CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired the common stock of RH Donnelley between July 26, 2007 and

May 29, 2009, inclusive. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which defendants have or had a controlling interest.

12.    The members of the Class are so numerous and geographically disperse across the country so that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, there are over 68,801,513 shares of RH Donnelley common stock outstanding, and Plaintiff believes that there are hundreds, if not thousands, of Class members. Members of the Class may be identified from records maintained by RH Donnelley or its transfer agent and may be notified of the pendency of this action by mail.

13.    Plaintiff's claims are typical of the claims of the other members of the Class in that all members of the Class have been damaged by the acts of Defendants, which caused members of the Class to purchase RH Donnelley common stock at artificially inflated prices.

14.    Plaintiff will fairly and adequately protect the interests of the other members of the Class. To assist him in that endeavor, Plaintiff has retained counsel competent and experienced in Class and securities litigation. Plaintiff is not aware of any interest which is antagonistic to the interests of the Class.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants' acts, as alleged herein;

(b)    whether any materially false or misleading statements were made and/or

Defendants omitted material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

16.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to pursue individual redress for the damages caused to them by Defendants' acts. Plaintiff is not aware of any difficulty that will be presented in managing this action as a Class action.

## SUBSTANTIVE ALLEGATIONS

17.    On July 26, 2007, the Company reported its second quarter 2007 financial results. The press release stated in relevant part:

> "The highlight of the quarter was the growth in our AT&T markets in Illinois," said David C. Swanson, chairman and CEO of R.H. Donnelley. "Second quarter is that region's largest ad sales period and includes the highly competitive Chicago market. We've worked hard over the last two years to make improvements there and it's rewarding to see the results of those efforts. Our robust suite of Internet solutions in addition to our print yellow pages are proving to be a very effective combination in larger markets. Our progress in Illinois was partially offset by the impact of the soft real estate sector and the challenges in major metro markets in our EMBARQ and Qwest markets."

18.    On September 18, 2007, the Company reported updates to 2007 guidance. The press release stated in relevant part:

> "Notwithstanding challenges in some of our major metro markets and the housing sector in Nevada and Florida, the inclusion of Business.com adds 100 basis points to ad sales performance this year." said Steven M. Blondy, executive vice president and CFO for R.H. Donnelley. "We also expect to deliver strong EBITDA

and free cash flow on plan. We're confident in the strength of our diversified business and our growth prospects, particularly with our new search marketing products and <u>Business.com</u>."

19.    On October 25, 2007, the Company reported its third quarter 2007 financial results, in a release which stated in relevant part:

> "During the quarter, we closed the Business.com acquisition, infusing significant talent and leading search technology into R.H. Donnelley's online advertising operations. In addition, we significantly advanced our strategy by investing in marketing consultant training and extending the Dex market brand. We have recently implemented our Triple Play solution across all markets, ahead of our year-end completion goal," said David C. Swanson, chairman and CEO of R.H. Donnelley. "As anticipated, third quarter ad sales performance reflected the housing weakness in Florida and Nevada; nevertheless, we delivered solid EBITDA and free cash flow due to the strength of our advertising products and diversified customer base. In addition, we recently refinanced a significant portion of our capital structure that enables us to reduce interest costs, simplify our capital structure and enhance operating and financial flexibility."

20.    On December 4, 2007, the Company issued a press release entitled *R.H. Donnelley Announces 2008 Guidance and $100 Million Share Repurchase Plan*. The press release stated in relevant part:

> During its presentation, the company will also affirm its 2007 outlook, which was last updated on October 25, 2007, with the exception of weighted average fully diluted shares outstanding for the year, which is now expected to be 72.0 million versus the previous guidance of 72.5 million.

21.    On February 28, 2008, the Company reported it fourth quarter and full year 2007 financial results, and stated in relevant part:

> "Though we are pleased with our 2007 accomplishments, weaker economic conditions than originally anticipated have created a more difficult selling environment. As a result, we have lowered our outlook for 2008. Furthermore, given the recent decline in the share price and the near-term economic outlook, we have decided not to initiate a dividend in order to apply all cash flow towards debt repayment. I am confident that we remain well positioned for growth once we move past the current cyclical challenges."

6

22.    On May 8, 2008, during a Company earnings conference call, Defendant Swanson

announced a major refinancing that would diminish near-term mandatory debt repayments,

extend debt maturities and enhance the Company's operating flexibility over the next few years:

> First, we are launching a major refinancing today that will
> diminish near-term mandatory debt repayments, extend debt
> maturities and enhance our operating flexibility over the next few
> years. Steve will walk you through the details in a moment.

23.    During this May 8, 2008 conference call, Defendant Blondy also elaborated by

stating:

> . . .  we're launching a major refinancing program that will
> effectively eliminate near-term debt amortizations, extend
> maturities and reduce debt principal outstanding. And third, we're
> making significant progress on our cost reduction program. As a
> result, we are confirming 2008 guidance."
>
> *       *       *
>
> During the first quarter, we applied free cash flow to reduce net
> debt by $74 million, resulting in net debt at the end of the quarter
> of $9.95 billion representing 6.9 times leverage. Our revolver
> availability remains a healthy $365 million.
>
> This morning we are also launching a three-part refinancing with
> the leadership of J.P. Morgan and Banc of America. A summary
> of our refinancing plan follows. Number one, $1.1 billion of Dex
> West bank debt maturing next year is being refinanced with new
> Dex West credit facilities. This will extend maturities until 2015
> and effectively eliminate all mandatory amortization over the next
> couple of years. Number two, we are also amending RHD Inc.'s
> credit agreement with outstanding borrowings of $1.5 billion to
> extend the maturity of the revolver and enhance covenant
> flexibility thereby accommodating additional unsecured debt. And
> three, as announced in a separate press release this morning, RHD
> Inc. is offering to exchange new senior unsecured notes for a
> portion of outstanding RHD Corp. notes. Though final details
> remain subject to market conditions, as a result of these
> transactions, we expect our total debt balance to decline. And
> while our average interest expense will increase, *we have
> effectively eliminated all near-term maturities and covenant
> uncertainties.*

(Emphasis added).

24.    The foregoing statements were clear that the Company had taken steps enabling it to assure its stockholders that there was no "near term" liquidity catastrophe looming on the horizon.

25.    Thereafter, the Company filed its Form 10-Q for the quarterly period ended June 30, 2008 ("June 2008 Form 10-Q") with the SEC. This document, which was signed by Defendants Blondy and Sauder, stated that the Company had amended its senior secured credit facility in order to (i) attain additional covenant flexibility and to (ii) extend the maturity date of $100.0 million of its revolving credit facility to June 2011. The June 2008 Form 10-Q also represented that: "Our present intention is to repay borrowings under all revolvers in a timely manner and keep any outstanding amounts to a minimum." The June 2008 Form 10-Q also stated in relevant part:

> On June 6, 2008 and in conjunction with the debt exchanges, we amended RHDI's senior secured credit facility ("RHDI Credit Facility") in order to, among other things, permit the debt exchanges and provide additional covenant flexibility. In addition, as part of the amendment, RHDI modified pricing and extended the maturity date of $100.0 million of its revolving credit facility (the "RHDI Revolver") to June 2011. The remaining $75.0 million will continue to mature in December 2009.
>
> On June 6, 2008, we refinanced the Dex Media West credit facility. The new Dex Media West credit facility consists of a $130.0 million Term Loan A maturing in October 2013, a $950.0 million Term Loan B maturing in October 2014 and a $90.0 million revolving credit facility maturing in October 2013 ("Dex Media West Revolver"). In the event that more than $25.0 million of Dex Media West's 9.875% Senior Subordinated Notes due 2013 (or any refinancing or replacement thereof) are outstanding, the Dex Media West Revolver, Term Loan A and Term Loan B will mature on the date that is three months prior to the final maturity of such notes. The new Dex Media West credit facility includes a $400.0 million uncommitted incremental facility ("Incremental Facility") that may be incurred as additional revolving loans or additional term loans subject to obtaining commitments for such loans. The Incremental Facility is fully available if used to

refinance the Dex Media West 8.5% Senior Notes due 2010, however is limited to $200.0 million if used for any other purpose.

Credit Facilities

At June 30, 2008, total outstanding debt under our credit facilities was $3,614.9 million, comprised of $1,433.9 million under the RHDI Credit Facility, $1,101.0 million under the Dex Media East credit facility and $1,080.0 million under the new Dex Media West credit facility.

\*       \*       \*

***Our present intention is to repay borrowings under all revolvers in a timely manner and keep any outstanding amounts to a minimum.***

(Emphasis added).

26.    On July 31, 2008, the Company held an earnings call with analysts and investors.

It was at this conference that Defendant Swanson stated in relevant part that:

. . . in June, we completed a series of re-financings that significantly reduced mandatory debt prepayments through 2009 and extended our debt maturity schedule. And finally, as a result of all of the above, we were able to reduce net debt by $230 million in the quarter.

27.    Defendant Blondy also elaborated at this conference as follows:

Turning to capital structure. Net debt at June 30th of $9.7 billion was $230 million lower than last quarter, reflecting strong cash flow and the impact of our debt re-financings. Leverage at June 30th was 6.8 times. Our Q2 re-financings accomplished three important goals as highlighted in the debt maturity slide filed with our earnings release today. First, if we do start mandatory payments over the next six quarters by $740 million to just $140 million; second, it extended the maturity of $1.2 billion in Dex West bank debt until 2014; and third, it eliminated a $170 million of debt via the bond exchange.

We're very pleased with these results, especially given the challenging credit market environment. Our next debt maturities are now two years away with RHD Inc. bank to Dex West bonds coming due in 2010. Both at the opco [ph] level, these borrowers benefit from lower leverage and structural seniority. We expect to be opportunistic as market windows open. And now have an extended runway to work with. ***Our continuing strong cash flow generation and extended debt maturities ensure ample liquidity***

> *for the foreseeable future. Our entire $365 million of revolver*
> *deposit remains undrawn as well.*

(Emphasis added).

28.     On November 2, 2008, the Company held an earnings call with analyst and investors. It was at this conference that Defendant Blondy stated that the Company's debt restructuring had eliminated all debt maturities until 2010, and reassured the investment community that prudent management of its debt and liquidity position would enable the Company to "weather the economic storm" and pay its bills "for a long, long time":

> During Q3, we repaid $35 million of bank debt at par and we repurchased $187 million principle value of RHD Corp notes in the open market at an average price of 49% of face. Of this amount, approximately $22 million closed in October, and so is not reflected in our Q3 financials. *Our next debt maturities are not till 2010* and at the APCO [ph] level, which benefits both from lower leverage and structural seniority.
>
> Required debt payments through the end of 2009 are only $135 million. In the meantime, our strong cash flow and our full $365 million revolver capacity provides ample liquidity. Despite the weak economy, we still expect full-year 2008 guidance within our previously announced range, albeit at the low end. We expect ad sales to decline approximately 8%, EBITDA of $1,350 million, and free cash flow of around $475 million. However, we now expect improved year-end net debt at below $9.5 billion, reflecting the added value we recaptured via the bond repurchases. Expectations for net revenue and share count are unchanged at $2.6 billion and 70 million respectively.
>
> To wrap up, we remain focused on three key financial priorities, discipline in cost management, investing in critical growth initiatives, and reducing debt. *That should allow us the weather the economic storm and be well positioned to grow once the market recovers.*
>
> *       *       *
>
> *In terms of suppliers' fear, we are hearing nothing from anybody, I mean, as you know, we still have a lot of cash flow here and continue to pay our bills and expect to for a long, long time.*

(Emphasis added).

29.    On March 12, 2009, the Company issued a press release stating that, although the Company continues to generate robust EBITDA and has significant liquidity to meet all its financial and business obligations, the Company had hired a financial advisor to assist it in addressing the Company's 2010 debt maturity.  The press release stated:

> R.H. Donnelley has engaged Lazard as its financial advisor to assist in the evaluation of its capital structure, including various balance sheet restructuring alternatives.  "Our goal is to better position R.H. Donnelley for the future by establishing a more sustainable capital structure," said Steven M. Blondy, executive vice president and CFO.  "We have significant debt maturities commencing in 2010 that we are working to address.  Though we intended to refinance this debt prior to maturity, it may no longer be possible to do so given the current state of the capital markets.  *In the meantime, the company continues to generate robust EBITDA and has significant liquidity to meet all our financial and business obligations.*"

> Blondy continued, "We plan to initiate discussions with our banks and bondholders about amending, refinancing or restructuring our debt obligations.  Whichever path we choose to strengthen our balance sheet, R.H. Donnelley will continue to provide outstanding service and support to our customers, while also remaining committed to our employees and business partners.  Our print and digital solutions continue to be the best way for local businesses to connect with ready-to-buy consumers, which should position R.H. Donnelley for healthy growth once the economy stabilizes."

> As previously reported, R.H. Donnelley borrowed $361 million from the revolving credit facilities of three of its operating subsidiaries on February 17, 2009.  The Company borrowed the cash in order to increase liquidity and financial flexibility given the continuing uncertainty in the global credit markets.  *As of February 28, 2009, the company had more than $500 million of cash and cash equivalents on hand*.

(Emphasis added).

30.    On or about March 31, 2009, the Company disseminated its consolidated financial statements for the fiscal year ended December 31, 2008 to the investing public ("2009 Form 10-K").  This document contained a section entitled "Management's Narrative Analysis of the

Results of Operations" which reassured investors of the Company's ability to continue as a going

concern through February 2010 as follows:

> ***Based on current financial projections, we expect to be able to continue to generate cash flow from operations in amounts sufficient to satisfy our interest and principal payment obligations through February 2010.*** However, such estimates also indicate that our cash flows from operations will not be sufficient to satisfy maturing debt obligations commencing on March 31, 2010 and continuing thereafter.

(Emphasis added).

     31.    The 2009 Form 10-K further disclosed that the Company had made

$55,728,000.00 of "voluntary" loan prepayments during the quarter ended December 31, 2008,

further reinforcing the notion that the Company had sufficient liquidity to continue as a going

concern through February 2010.

     32.    On April 15, 2009, the Company issued a press release disclosing that the

Company had elected to exercise a 30-day grace period on $55 million in interest payments.

     33.    On that same day, the Company disseminated its condensed consolidated

financial statements for the three months ended March 31, 2009 to the investing public. This

document contained a section entitled "Management's Narrative Analysis of the Results of

Operations" which indicated that the Company's cash/liquidity projections had improved and

that the Company was projecting an ability to fund operations through March 2010, not February

2010 as previously represented.

> Based on current financial projections, we expect to be able to continue to generate cash flow from operations in amounts sufficient to satisfy our interest and principal payment obligations through March 2010. However, such estimates also indicate that our cash flows from operations will not be sufficient to satisfy maturing debt obligations commencing in the second quarter of 2010 and continuing thereafter.

34.    On May 13, 2009, the Company issued a press release stating that the Company was seeking forbearance from certain of its bondholders and bank lenders with respect to the consequences of the expiration of the 30-day grace period relating to a $55 million interest payment on one series of the Company's senior unsecured notes.   The press release stated that the Company "currently expects to obtain forbearance agreements from certain of its bondholders and the requisite bank lenders under the company's and its subsidiaries' applicable debt agreements."

35.    On May 14, 2009, the Company issued a press release stating that it had secured forbearance agreements from its bondholders and bank lenders, and that it elected to exercise grace periods for pending interest payments.  The press release stated:

> R.H. Donnelley, one of the nation's leading consumer and business-to-business local commercial search companies, today said it has entered into forbearance agreements with certain of its bondholders and bank lenders with respect to the consequences of the expiration of the 30-day grace period relating to a $55 million interest payment on one series of the company's senior unsecured notes. The relevant interest payment was due April 15, 2009 and the 30-day grace period for such payment expires on May 15, 2009. The bondholders and bank lenders party to the forbearance agreements agreed not to pursue their rights and remedies under the company's and its subsidiaries' applicable debt agreements relating to such interest payment through May 28, 2009.

> The company also said that it would exercise a 30-day grace period on an aggregate of approximately $78 million in interest payments due on May 15, 2009 on four series of notes issued by its subsidiaries, the 11.75 percent Senior Notes due 2015 of R.H. Donnelley Inc., the 8 percent Notes due 2013 and 9 percent Discount Notes due 2013 of Dex Media, Inc. and the 5 7/8 percent Senior Notes due 2011 of Dex Media West LLC, while it continues to have discussions with ad hoc steering committees representing certain of its bondholders and banks lenders.

> The company said the missed interest payments on the subsidiary notes do not constitute events of default under the bond indentures or any of its or its subsidiaries' other debt agreements unless R.H. Donnelley Inc., Dex Media, Inc. or Dex Media West LLC fails to

make the payment within 30 days of the due date, absent an extension.

36.  On May 20, 2009, the Company issued a press release stating that it was seeking the support of its bank lenders as part of a potential comprehensive debt restructuring plan. The press release stated:

> R.H. Donnelley, one of the nation's leading consumer and business-to-business local commercial search companies, today said it is holding separate conference calls with its bank lenders and the ad hoc steering committee of certain of its bondholders to discuss details relating to a potential debt restructuring plan. Public lenders can restrict themselves for the remainder of the forbearance period and obtain detailed information about the company's business plan and the potential debt restructuring.

> The company hopes to obtain support for a debt restructuring from its bank lenders and bondholders before the expiration on May 28, 2009 of the forbearance agreements currently in place. There can be no assurances that the company will be successful in obtaining support from its bank lenders and bondholders on a debt restructuring plan.

37.  Each and every one of the foregoing statements were materially false and misleading.

38.  Without any prior notice and with sufficient liquidity to fund operations through March 31, 2010, on May 29, 2009, the Company filed for a voluntary petition for Chapter 11 bankruptcy protection citing a desire to reduce debt.

39.  A May 29, 2009, *Reuters* news article (as quoted in *Web Moneynews - Yellow Pages Co. R.H. Donnelley Files for Bankruptcy*) quoted Defendant Swanson as stating: "This is an action that is necessary not because we had liquidity issues but because of the acquisition strategy and financing strategy for those acquisitions of the last several years."

40.  In other words, the Company had no trouble paying its bills. Indeed, money was not a problem. As the May 29, 2009 *Reuters* news article stated: "The company does not plan to

seek debtor-in-possession, or DIP, financing.  It said it has more than $300 million in cash, and that cash flow from operations will more than fund operations during bankruptcy."

41.    The Company filed for bankruptcy because, due to the world-wide economic downturn, the Company found that the long term debt which it assumed in connection with business acquisitions exceeded the worth of the acquired businesses. And, unlike the millions of individuals who continue to pay their home mortgages, despite the fact that their homes are currently worth less than their mortgage indebtedness, the Company elected to employ business friendly bankruptcy law transfer ownership of the Company from its stockholders to its bond holders in a pre-arranged conspiracy designed to eliminate $6 billion of debt while retaining the assets acquired with this debt.

42.    According to the *Reuters* news article, pursuant to the Company's pre-arranged bankruptcy plan:  "***The company's unsecured bonds of about $6 billion will be exchanged for 100 percent equity of the restructured company, while existing shareholders will be completely wiped out.***"  (Emphasis added).

43.    A May 30, 2009 article published by www.newsobserver.com  put it another way: "The company's plan includes exchanging about $6 billion in unsecured debt in exchange for handing over 100 percent ownership of the business to bondholders, eradicating the vestiges of shareholders' value, and $300 million in new debt."  This news article provided Defendant Swanson's view of the shareholder carve-out: "the truth of the matter is, the equity holders got wiped out awhile ago."

44.    Contrary to the view of Defendant Swanson, Plaintiff in this action, and the numerous stockholders whom this Plaintiff seeks to represent, see it differently.  They were

wiped out when Defendants cut a deal which, to their detriment, turned over 100% of the Company's ownership to bondholders and rendered their shares worthless.

45.     The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company was not adequately reserving for its bad debts in violation of GAAP, causing its financial results to be materially misstated;

(b)     The downward pressure the Company was experiencing with its advertising revenue was not exclusively due to cyclical challenges but was also due to a permanent shift in customers moving away from print yellow pages advertising;

(c)     The Company had far greater exposure to liquidity concerns and ratings downgrades than it had previously disclosed; and

(d)     Given the turmoil in the economy and the trends related to a shift away from print advertising, the Company had no reasonable basis to make projections about its 2008 results.

**ADDITIONAL SCIENTER ALLEGATIONS**

46.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding RH Donnelley, their control over, and/or receipt and/or modification of RH Donnelley' allegedly materially misleading misstatements

and/or their associations with the Company which made them privy to confidential proprietary information concerning RH Donnelley, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

47.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of RH Donnelley common stock and operated as a fraud or deceit on Class Period purchasers of RH Donnelley common stock by failing to disclose the material adverse facts detailed herein.  As a result of their purchases of RH Donnelley common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

48.    By failing to disclose the material facts detailed herein, Defendants presented a misleading picture of RH Donnelley's business and prospects.  Defendants' false and misleading statements had the intended effect and caused RH Donnelley common stock to trade at artificially inflated levels throughout the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

49.    At all relevant times, the market for RH Donnelley common stock was an efficient market for the following reasons, among others:

(a)    RH Donnelley common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market (the Company's common stock was delisted from the NYSE and quoted over-the-counter) (the Company's stock now trades on the pink sheets (RHDCQ.PK);

(b)    as a regulated issuer, RH Donnelley filed periodic public reports with the SEC;

(c)    RH Donnelley regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    RH Donnelley was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

50.    As a result of the foregoing, the market for RH Donnelley common stock promptly digested current information regarding RH Donnelley from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of RH Donnelley common stock during the Class Period suffered similar injury through their purchase of Donnelley common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of RH Donnelley who knew that those statements were false when made.

## COUNT I

### For Violation of § 10(b) Of The Exchange Act
### And Rule 10b-5 Against Defendants

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of RH Donnelley common stock during the Class Period.

55.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for RH Donnelley common stock.  Plaintiff and the Class would not have purchased RH Donnelley common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

56.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of RH Donnelley common stock during the Class Period.

## COUNT II

### For Violation of § 20(a) of The Exchange Act
### Against Defendants

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     Defendants acted as a controlling person of RH Donnelley within the meaning of § 20(a) of the Exchange Act.  By reason of their positions at RH Donnelley, Defendants had the power and authority to cause RH Donnelley to engage in the wrongful conduct complained of herein.  By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as class counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, including prejudgment and post-judgment interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: October 26, 2009                    **RIGRODSKY& LONG, P.A.**

By: _____
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Timothy J. MacFall
919 N. Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rigrodskylong.com
       bdl@rigrodskylong.com
       tjm@rigrodskylong.com

*Local Counsel*

**GAINEY & McKENNA**

Thomas J. McKenna
295 Madison Avenue
New York, NY 10017
Telephone: (212) 983-1 300
Facsimile: (212) 983-0383
Email: tjmlaw2001@yahoo.com
       tjmckenna@gaineyandmckenna.com

*Attorneys for Plaintiff*

21

## CERTIFICATION OF NAMED PLAINTIFF

To:   Thomas J. McKenna, Esq.          Tel:   212-983-1300
      Gainey & McKenna                 Fax:   212-983-0383
      295 Madison Avenue, 4th Floor    e-mail: timckenna@gaineyandmckenna.com
      New York, New York 10017

I, Donald B. Biggerstaff ("Plaintiff") hereby retain Gainey & McKenna and such co-counsel it deems appropriate to associate with, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff reviewed the draft complaint to be filed in this matter and authorized the filing.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *R.H. Donnelley Corp.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---------------|--------------|----------|------|-----------------|
| See attached  |              |          |      |                 |
|               |              |          |      |                 |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years: Jan Buettgen v. Katherine J. Harless, Civil Action No.: 3:09-CV-791 (S.D. Tex.)

Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring suit to recover for investment losses.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3RD day of AUGUST, 2009

Donald B. Biggerstaff
_____
Signature

DONALD B. BIGGERSTAFF
_____
Print Name (& Title if applicable)

**Exhibit A to the Certification of Donald B. Biggerstaff**

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Shares |
|---|---|---|---|---|
| 2,300 | RHDC.PK | Buy | 08/18/08 | $2.15 |
| 12,650 | RHDC.PK | Buy | 09/04/08 | $3.09 |
| 10,500 | RHDC.PK | Buy | 09/05/08 | $3.15 |
| 13,500 | RHDC.PK | Buy | 09/16/08 | $2.02 |
| 3,500 | RHDC.PK | Buy | 09/26/08 | $1.97 |
| 2,500 | RHDC.PK | Buy | 10/01/08 | $1.90 |
| 2,500 | RHDC.PK | Buy | 10/02/08 | $1.90 |
| 5,000 | RHDC.PK | Buy | 10/03/08 | $1.89 |
| 2,100 | RHDC.PK | Buy | 10/07/08 | $1.40 |
| 1,900 | RHDC.PK | Buy | 10/09/08 | $0.96 |
| 4,000 | RHDC.PK | Buy | 10/16/08 | $0.65 |
| 7,500 | RHDC.PK | Buy | 10/24/08 | $0.82 |
| 25,000 | RHDC.PK | Buy | 11/14/08 | $0.49 |
| 5,000 | RHDC.PK | Buy | 11/20/08 | $0.31 |
| 10,000 | RHDC.PK | Buy | 12/04/08 | $0.28 |
| 127,500 | RHDC.PK | Buy | 03/02/09 | $0.1732 |
| 1,000 | RHDC.PK | Buy | 03/03/09 | $0.12 |
| 18,000 | RHDC.PK | Buy | 03/06/09 | $0.1086 |
| 14,500 | RHDC.PK | Buy | 05/21/09 | $0.16 |
| 70,430 | RHDC.PK | Buy | 05/26/09 | $0.1617 |
| 18,570 | RHDC.PK | Buy | 05/27/09 | $0.16 |
| 20,500 | RHDC.PK | Buy | 05/28/09 | $0.1498 |
| 1,900 | RHDC.PK | Sell | 08/18/08 | $2.17 |
| 300 | RHDC.PK | Sell | 08/21/08 | $2.23 |
| 250 | RHDC.PK | Sell | 09/11/08 | $3.00 |
| 7,000 | RHDC.PK | Sell | 11/18/08 | $0.36 |
| 5,000 | RHDC.PK | Sell | 11/20/08 | $0.27 |
| 10,000 | RHDC.PK | Sell | 11/24/08 | $0.23 |
| 31,200 | RHDC.PK | Sell | 12/12/08 | $0.36 |
| 600 | RHDC.PK | Sell | 12/15/08 | $0.36 |
| 24,700 | RHDC.PK | Sell | 12/16/08 | $0.38 |